IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs January 25, 2011

## STATE OF TENNESSEE v. DENNIS LEE ROSE

**Direct Appeal from the Criminal Court for Sullivan County**
**No. S54,464      R. Jerry Beck, Judge**

**No. E2010-00734-CCA-R3-CD - Filed February 1, 2012**

A Sullivan County Criminal Court Jury convicted the appellant, Dennis Lee Rose, of first degree premeditated murder and two counts of aggravated assault. The trial court sentenced him to concurrent sentences of life for the murder conviction and three years for each of the aggravated assault convictions. On appeal, the appellant contends that (1) the evidence is insufficient to support the convictions; (2) the trial court erred by admitting evidence of prior bad acts under Rule 404(b), Tennessee Rules of Evidence; (3) the trial court erred by refusing to allow the defense to use the prosecutor's notes for impeachment and by refusing to allow the defense to make an offer of proof regarding the State's failure to provide the notes to the defense before trial; (4) the trial court erred by refusing to allow the defense to present surrebuttal testimony; and (5) the appellant's convictions for premeditated murder and one count of aggravated assault violate double jeopardy. Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and JAMES CURWOOD WITT, JR., J., joined.

Larry R. Dillow, Kingsport, Tennessee, for the appellant, Dennis Lee Rose.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; H. Greeley Wells, Jr., District Attorney General; and Joseph Eugene Perrin, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

Deputy Chief David Quillen of the Kingsport Police Department testified that about 2:00 p.m. on November 13, 2007, he was in his patrol car and heard a "serious call" over the police radio. He said he responded to the scene and saw another patrol car "going up a driveway" just off Arbutus Avenue. Deputy Quillen parked his patrol car behind the first patrol car, walked up the driveway, and saw a young man lying on his back. Two people were kneeling over the man, who was unresponsive. Deputy Quillen checked the man for a pulse but could not find one. The man was not breathing and had a small amount of blood on his left abdomen. Deputy Quillen began chest compressions while the other officer performed mouth-to-mouth resuscitation until paramedics arrived.

Twenty-one-year-old Mark "Douglas" Dorton testified that in November 2007, he was living with his parents in a trailer off Arbutus Avenue. Douglas[1] said that on the afternoon of November 13, he saw his twenty-year-old cousin, David Dorton, "down the hill" at their grandmother's house. David and Douglas went to a Sunoco convenience store, which was about sixty feet from their grandmother's home, to buy cigarettes. They were at the store about one minute. Then they drove toward the Model City Apartments, where David's girlfriend lived. David was driving his blue Geo, and Douglas was sitting in the front passenger seat. As they were traveling on Shipp Springs Road, Douglas noticed a white Chevy Tahoe behind them. The appellant was driving the Tahoe. Douglas said that David sped up to get away from the appellant but that the appellant "sped right up behind us." Douglas said David stated, "'We got problems.'"

Douglas testified that David drove eighty to ninety miles per hour but that the appellant followed right behind them. The chase continued for about thirty minutes. David turned the Geo around in a church parking lot and headed back toward Arbutus Avenue. The Tahoe passed the Geo on Stone Drive. Douglas said that the appellant "was saying a bunch of stuff"; that the Tahoe slowed down, trying to stop the Geo; and that the Geo passed the Tahoe. Douglas said that he was scared and that he used his cellular telephone to call his mother. His mother did not answer, so he called his stepfather. He said he told his stepfather that "we was coming up there because we had somebody chasing us; to meet me outside." Douglas's mother called his cellular telephone, and he told her what was happening. He said that the appellant was "right on our bumper" and that David "sped up Arbutus." The appellant's Tahoe made contact with the rear of the Geo. David parked the Geo in the driveway of Douglas's trailer while the appellant backed the Tahoe into a neighbor's driveway. David got out of the Geo and walked down the hill to the Tahoe. Douglas said that David did not have anything in his hands and that David asked the appellant, "'What is your problem?'" Douglas said the appellant stated, "'I will kill you.'" Douglas got out of

---

[1]Because the victims share a surname, we will refer to them by their first names for clarity.

the Geo and walked to the appellant's vehicle. He said the appellant "came out the window with his right arm with a knife" and stabbed David in the side. David fell to the ground, and the appellant sped away. Douglas helped David up and walked him into the yard. David fell, and Douglas's mother and sister performed CPR while Douglas called 911. Later, Douglas spoke with the police and picked the appellant's photograph out of a photograph array.

Douglas testified that seven months before the stabbing, David set up a meeting with the appellant in order for David "[t]o get pills and rip [the appellant] off." Douglas went with David to meet the appellant. The appellant had Lortabs in his hand, and David grabbed the pills. Douglas said that as he and David were running away from the appellant, the appellant said, "'I will get you.'" Douglas acknowledged having two prior convictions for misdemeanor theft.

On cross-examination, Douglas acknowledged that he telephoned his mother and stepfather during the chase on November 13 but that he did not telephone the police. He said he did not want the police involved because David had just gotten out of jail and was trying to stay out of trouble. Douglas also acknowledged that he did not call 911 and said that he "thought the safest place to go was [his] house." After the Tahoe struck the Geo, the Geo had dents in the rear bumper. David parked the Geo about thirty feet from the Tahoe, got out of the Geo, and walked toward the Tahoe. Douglas acknowledged that he gave a statement to the police on November 13, 2007. In the statement, he said, "'I heard [the appellant] say something like, "I am going to kill you."'" However, Douglas testified that he was sure the appellant told David, "'I'm going to kill you.'" He acknowledged that the appellant never got out of the Tahoe and that David walked up to the Tahoe despite the appellant's threat. Douglas said that he saw the knife come out of the appellant's window and that David "was swinging."

Leslie Hill, Douglas Dorton's mother and David Dorton's aunt, testified that on the afternoon of November 13, 2007, Douglas and David left their grandmother's home, which was just below Mrs. Hill's trailer. Later that afternoon, Mrs. Hill was at the nearby Sunoco with her daughter and called her son's cellular telephone. She said that Douglas sounded "very frustrated and scared" and that she saw David's blue Geo pass by the Sunoco. The Geo was traveling forty-five to fifty-five miles per hour, and a white Tahoe was one to one and one-half feet behind it. The Geo drove onto the curb and turned onto Arbutus Avenue. The Tahoe also drove onto the curb and turned onto Arbutus. Mrs. Hill said that she heard "profanity being screamed, telling him he needed to stop" from the Tahoe. She said that the Geo turned into her driveway and that the Tahoe hit the Geo, knocking the Geo into the driveway "a little bit." Mrs. Hill pulled out of the Sunoco parking lot and saw the appellant driving the Tahoe out of her driveway. The Tahoe almost struck a blue minivan. When Mrs. Hill got to her home, she saw David lying on the ground. Mrs. Hill and her daughter

performed CPR on him.

On cross-examination, Mrs. Hill acknowledged that she gave a statement to police on November 13, 2007, and that she did not tell them she heard the appellant yelling profanities from the Tahoe. On redirect examination, Mrs. Hill testified that she gave the statement at the hospital and that she was very distraught at the time.

Brian Hill, Leslie Hill's husband and Douglas Dorton's stepfather, testified that on the afternoon of November 13, 2007, he was at home and received a telephone call from Douglas. Douglas sounded unusual, and Mr. Hill could hear David Dorton yelling in the background. Mr. Hill said he told Douglas to "wait till I get my shoes on, then come on to the house." Mr. Hill put on his shoes and went to the kitchen door to meet them. They were not there, so he went into the living room. He said he heard a car motor, went to the kitchen door, and saw Douglas and David "coming up the hill." Mr. Hill said that both of them were saying David had been stabbed and that neither of them had a weapon in his hand. David raised his shirt to show Mr. Hill where he had been stabbed and sat on the ground, and Mr. Hill's wife and daughter arrived. David's face was changing color, so Mr. Hill asked his wife to perform CPR.

On cross-examination, Mr. Hill testified that he had never seen the appellant before that day. While Mr. Hill was speaking with Douglas on the telephone, Douglas did not tell him to call the police or tell him who was following the Geo. Mr. Hill said he did not call 911 because "they normally are in disputes . . . I just thought it – whenever they come to the house it would be over."

Mistri Griffith testified that she was David Dorton's girlfriend for three and one-half years and lived in the Model City Apartments. She said that she knew the appellant "off and on" for about three years and that he and David were acquaintances. A few weeks before November 13, 2007, Griffith and David were driving toward David's grandmother's house and saw the appellant in a white Tahoe. Griffith said that as she and David pulled into the driveway, she heard the appellant tell David that David owed him money and "better pay him." She said the appellant also told David that the appellant was "going to kick his ass." David's mother, Sharon Brunke, was outside at the time and threatened to call the police. Griffith said that the appellant again told David "he'd better pay" the appellant, that the appellant backed out of the driveway, and that the appellant told David to "go ahead and hide behind his grandmother." Then the appellant parked nearby at Morrell's Garage and continued to yell that David better pay him. Griffith said that after the incident, she and David would be riding around Kingsport in David's Geo and that the appellant would follow them. The appellant followed them four or five times.

-4-

Brian Tipton testified that on November 13, 2007, he was working at Victory Lane Oil Change and had known the appellant about four or five years. Shortly after 2:00 p.m., the appellant arrived and asked to borrow five dollars for gas. The appellant was calm and acted normal. Tipton did not have any money to loan the appellant but gave him a gas can with some gas in it. The appellant put the gas in his Tahoe, used Tipton's cellular telephone, and left. The appellant returned three or four minutes later and asked to put something in Tipton's car. The appellant did not tell Tipton what it was. The appellant walked to Tipton's car, opened the door, closed the door, and left Victory Lane. A couple of hours later, Tipton looked in his car and saw a knife on the front seat. Tipton recognized the knife as belonging to the appellant. He called the police and gave the knife to them. He said he knew from prior conversations with the appellant that David Dorton had "ripped off" the appellant. He said that David "just grabbed the pills and ran" and that the appellant wanted money from David. Tipton saw the appellant regularly, and the appellant told Tipton on a regular basis that David owed him money.

On cross-examination, Tipton acknowledged that he gave a statement to police on November 13, 2007, and that he did not mention his and the appellant's conversations about the theft. He said he did not mention them because "I wasn't asked about anything that was before."

Sergeant Jason Bellamy of the Kingsport Police Department testified that he investigated the stabbing and went to Victory Lane Oil Change, which was several miles from Arbutus Avenue. Sergeant Bellamy spoke with Brain Tipton, who directed the officer to Tipton's car. Sergeant Bellamy looked inside and saw a closed, switchblade knife on the front seat. Sergeant Bellamy collected the knife.

Detective David Cole of the Kingsport Police Department testified that he responded to the scene of the stabbing on November 13. Other officers were present, and David Dorton had been removed from the scene. Detective Cole inspected the crime scene for evidence but did not find any blood or weapons. He saw a tire mark in some gravel in the lower parking area of a trailer. From his investigation, Detective Cole immediately began looking for the appellant, learned he lived on Gravelly Road, and arrested him. Detective Cole did not see any scratches, bruises, or choke marks on the appellant. Detective Cole processed the appellant's Tahoe and found no blood on the Tahoe's interior or exterior. However, he collected fingerprints just below the window on the driver's door and directly above the door. He sent the prints to the Tennessee Bureau of Investigation (TBI) for comparison. Detective Cole also sent the knife collected by Sergeant Bellamy to the TBI. Detective Cole said that the knife could not be opened unless a button was pushed and that the knife blade was about four and one-half inches long.

On cross-examination, Detective Cole testified that no tread detail was in the tire mark. Therefore, the mark could not be matched to the appellant's Tahoe. After the appellant's arrest, Detective Cole asked him to give a statement. The appellant refused and was put back into his jail cell. About forty minutes later, the appellant asked to see Detective Cole again, and Detective Cole questioned him.

David Hoover of the TBI testified as an expert in latent fingerprint identification that he processed the fingerprints collected by Detective Cole. Only one fingerprint below the driver-side window was sufficient for comparison. It matched the appellant's left ring finger. Hoover also examined the switchblade knife but did not find any fingerprints that could be used for comparison.

Special Agent Michael Turbeville of the TBI testified as an expert in forensic serology and DNA analysis that he inspected the switchblade knife and found a reddish-brown stain in the crevices of the blade. The stain was blood and belonged to the victim. On cross-examination, Agent Turbeville testified that the amount of blood was small and that he could not see any blood on the knife's broad surfaces.

Dr. Paul Benson, a former forensic pathologist for East Tennessee State University, testified as an expert in forensic pathology that he performed David Dorton's autopsy. The victim had a stab wound in his left abdomen that perforated his descending colon, small bowel, and descending aorta. The wound to the aorta was the most significant and was fatal. Dr. Benson found bleeding in the victim's abdomen in the area surrounding the organs and in the retroperitoneal space behind the organs. The stab wound was half-way between the victim's armpit and hip, and an abrasion was on the lower part of the wound. The direction of the wound was left to right and slightly downward. Dr. Benson examined a photograph of the switchblade knife found in Brian Tipton's car and concluded that the knife was consistent with having made the stab wound. The victim's urine tested positive for marijuana. However, the victim's blood tested negative for marijuana, meaning the victim was not under the influence of the drug at the time of his death.

On cross-examination, Dr. Benson acknowledged that a different knife could have caused the victim's injuries. The victim had a bruise under his left eye, but the bruise was not a recent injury.

The twenty-two-year-old appellant testified on his own behalf that he used to work as an electrical engineer for Blevins Electric. On November 13, 2007, he left his home and drove to the Sunoco gas station, where he saw David Dorton. The appellant said that he suffered from headaches and that he asked if David knew where he could get "anything for my headache." David said they could get some Lortabs at the Model City Apartments.

David drove his blue Geo to the apartment complex, and the appellant followed in his white Tahoe. David went into one of the buildings but came out a few minutes later and said he could not get the pills. David told the appellant to follow him back to the Sunoco. When they got to the gas station, David turned onto Arbutus Avenue, and the appellant followed him. David drove to the top of the hill while the appellant backed the Tahoe into a gravel driveway. The appellant put the vehicle into park and started to open the driver's door. He saw David and Douglas Dorton running toward him, knew something was wrong, and got scared. He said he saw an object in Douglas's hand but could not determine what the object was. He said David "[came] through" the driver's window of the Tahoe, choked him, and tried to pull him out of the vehicle. He said that Douglas had a "silver blade," that the blade also came through the window, and that "I pushed the knife away from me." He explained, "As it [came] through the window of the vehicle I kind of grabbed it with both hands and shoved it to the left side of me." The knife stabbed David, and David fell off the Tahoe's running board.

The appellant testified that he left the scene. He ran out of gas at the Victory Lane Oil Change, and Brian Tipton gave him some gas in a gas can. The appellant put the gas into his Tahoe and drove to a gas station. He replenished the gas he had used in the can and returned the can to Tipton. The appellant said that he asked Tipton if he could put his knife in Tipton's car and that Tipton said yes. The appellant put his switchblade knife into the center console of Tipton's Honda Accord and left Victory Lane. He was scared and drove to his girlfriend's place of employment to talk with her. However, she was too busy to speak with him, so he drove home. The police arrived and arrested him. He said that he gave a statement to the police and that he told them exactly what he told the jury. He said that he never threatened David, that he feared for his life, and that he never meant for anyone to get hurt. He said that his Tahoe never struck the Geo and that the damage to the Geo was "prior to the incident." He said that he could not explain how blood got on his knife and that David and Douglas did not rob him prior to November 13.

On cross-examination, the appellant acknowledged that he was unemployed on November 13, 2007. He said that Lortabs were worth six or seven dollars each and that Oxycontins were worth thirty-five or forty dollars. He acknowledged that forty Lortabs would have been worth two hundred forty to two hundred eighty dollars. He said he told Brian Tipton that "an incident had occurred, but never did I state that the incident occurred to me." He denied telling Tipton that David took pills out of his hand or that he wanted money from David. He also denied pulling into David's grandmother's driveway two weeks before the stabbing and yelling that he wanted his money. He said that he did not drive close to the Geo on November 13 and that he did not drive over the curb. He said that David entered the Tahoe through the driver's window and that David put his hands around the appellant's throat. The knife was in Douglas's left hand, but the appellant never touched the

knife. At Victory Lane, the appellant took his closed, switchblade knife out of the Tahoe's center console. He said he put it in the Accord's center console because "I knew an incident had occurred and I just didn't want it in my possession." He said Tipton "clearly saw" the knife and "clearly saw" him put the knife into the Accord's center console. He acknowledged that he never told the police about Tipton or about leaving the knife in Tipton's car.

Sarah Dorton, David Dorton's grandmother, testified on rebuttal for the State that in November 2007, David lived with her. One day, she came out of her home and saw David's blue car in the driveway. The appellant's girlfriend, Mistri Griffith, was in the car. The appellant's Tahoe pulled into the driveway, and David went onto the front porch with his grandmother. Sarah Dorton said that the appellant "hollered something about he needed his money or he wanted his money" and that she told him, "'I'm calling the law.'" She said that the appellant drove across the street to Morrell's Garage and that he said, "'Go ahead and get behind your granny you skinny little bastard.'"

The jury convicted the appellant as charged for the first degree premeditated murder of David Dorton and two counts of aggravated assault by using a vehicle as a deadly weapon, a Class C felony. The trial court sentenced him to concurrent sentences of life for the murder conviction and three years for each of the aggravated assault convictions.

## II. Analysis

### A. Sufficiency of the Evidence

The appellant claims that the evidence is insufficient to support the convictions. The State argues that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. See State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. See id. Because a jury conviction removes the presumption

of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Regarding the first degree murder conviction, the appellant contends that the evidence fails to show premeditation. First degree murder is the premeditated and intentional killing of another person. Tenn. Code Ann. § 39-13-202(a)(1). A premeditated killing is one "done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d). The element of premeditation is a question of fact for the jury. State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003). Although the jury may not engage in speculation, it may infer premeditation from the manner and circumstances surrounding the killing. Bland, 958 S.W.2d at 660. In State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000), our supreme court delineated the following circumstances from which a jury may infer premeditation:

> [D]eclarations by the defendant of an intent to kill, evidence of procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, infliction of multiple wounds, preparation before the killing for concealment of the crime, destruction or secretion of evidence of the murder, and calmness immediately after the killing.

The jury may also infer premeditation from the establishment of a motive for the killing and the use of multiple weapons in succession. State v. Leach, 148 S.W.3d 42, 54 (Tenn. 2004).

Taken in the light most favorable to the State, the evidence shows that seven months before the stabbing, David Dorton stole Lortab pills from the appellant and that the appellant wanted David to pay him for the pills. The appellant repeatedly told Brain Tipton that David owed him money and repeatedly followed David around Kingsport. On the day of the stabbing, the appellant chased David and Douglas Dorton through Kingsport and back to Arbutus Avenue. David parked his car at Douglas's trailer and approached the appellant's Tahoe. The appellant said he would kill the victim. Douglas testified that neither he nor David had a weapon, and Detective Cole did not find any weapons at the scene. The appellant stabbed David in the abdomen with the appellant's switchblade knife, drove to Victory Lane, and disposed of the knife in Tipton's car. Tipton testified that the appellant was calm and acted normal. The appellant's declaration of an intent to kill before the stabbing, his use of a deadly weapon on the unarmed victim, his concealment of the murder weapon, his calmness immediately after the killing, and his motive for the killing sufficiently establish premeditation in this case.

The appellant also asserts that the evidence is insufficient to support the aggravated

assault convictions because David asked the appellant to follow him back to Arbutus Avenue and because the appellant did not chase the Dortons. As charged in the indictment, a person commits aggravated assault when the person intentionally or knowingly commits an assault by using or displaying a deadly weapon. Tenn. Code Ann. § 39-13-102(a)(1)(B). The "deadly weapon" in this case was a motor vehicle. See Tenn. Code Ann. § 39-11-106(5)(b); State v. Tate, 912 S.W.2d 785, 788 (Tenn. Crim. App. 1995). A person commits assault when the person "[i]ntentionally or knowingly causes another to reasonably fear imminent bodily injury." Tenn. Code Ann. § 39-13-101(a)(2).

Taken in the light most favorable to the State, the evidence shows that the appellant, who was driving his white Tahoe, chased the Dortons, who were in a blue Geo. Douglas testified that he was scared; that David was driving eighty to ninety miles per hour in an attempt to get away from the appellant; and that the appellant was "right on our bumper." During the incident, Douglas telephoned his stepfather and told him that he and David were being chased. Mr. Hill said that Douglas sounded unusual and that he could hear David yelling in the background. Douglas said he was trying to get back to his house because he thought they would be safe there. Leslie Hill testified that the Tahoe was only one to one and one-half feet away from the Geo as the vehicles passed the Sunoco and that Douglas sounded scared. She also said that as David turned into the driveway on Arbutus Avenue, the Tahoe hit the Geo, knocking the Geo into the driveway. Although the appellant claimed that David asked him to follow the Geo back to Arbutus Avenue and that the Dortons attacked him, the jury obviously accredited the State's witnesses. From the evidence, the jury could reasonably conclude that the appellant used his motor vehicle in a manner that intentionally caused the Dortons to fear imminent bodily injury. Therefore, the evidence is sufficient to support the aggravated assault convictions.

## B. Prior Bad Act Evidence

Next, the appellant contends that the trial court erred by allowing Douglas to testify that David stole Loretab pills from him and that he said, "I will get you" after the theft. He argues that testimony about the theft and threat was inadmissible pursuant to Tennessee Rule of Evidence 404(b) because the State failed to show by clear and convincing evidence that the incident occurred and that the probative value of the evidence was outweighed by its prejudicial effect. The State contends that the trial court properly admitted the evidence to show the appellant's motive. We agree with the State.

After the State's first witness, Deputy Quillen, testified, the State requested a jury-out hearing to determine whether Douglas could testify about David's stealing pills from the appellant and the appellant's subsequent threats to David. During the hearing, Douglas testified that several months before the stabbing, David planned a meeting with the appellant

for the purpose of stealing pain pills. Douglas went with David to meet the appellant. The appellant had Lortabs and Oxycontins in his hand. David grabbed the pills, and he and Douglas fled. Douglas said that as they were running away, the appellant said, "'I will get you.'" The appellant testified during the hearing that the incident never occurred. On rebuttal, the State called Brian Tipton, who testified that he was the appellant's friend and that the appellant claimed David had "ripped him off" by jerking pills out of his hand. Tipton said the appellant stated more than once that he wanted money from David. Mistri Griffith also testified on rebuttal for the State that about two weeks before the stabbing, the appellant followed her and David to David's grandmother's house. The appellant demanded money from David and threatened to harm him. At the conclusion of the hearing, the trial court ruled that the testimony of the State's witnesses was admissible to establish the appellant's motive and intent to kill the victim.

Tennessee Rule of Evidence 404(b) provides,

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:
>
> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
>
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
>
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

See also State v. Thacker, 164 S.W.3d 208, 240 (Tenn. 2005); State v. Parton, 694 S.W.2d 299, 302 (Tenn. 1985). A trial court's decision regarding the admission of Rule 404(b)

evidence will be reviewed under an abuse of discretion standard; however, "the decision of the trial court should be afforded no deference unless there has been substantial compliance with the procedural requirements of the Rule." State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997). We note that the trial court complied with the procedural requirements of the rule. Therefore, the appellant will not be entitled to relief unless the court abused its discretion.

Generally, "[o]nly in an exceptional case will another crime, wrong, or bad act be relevant to an issue other than the accused's character. Such exceptional cases include identity, intent, motive, opportunity, or rebuttal of mistake or accident." State v. Luellen, 867 S.W.2d 736, 740 (Tenn. Crim. App. 1992). In making its decision regarding the admissibility of the testimony, the trial court must first determine if the offered testimony is relevant to prove something other than the appellant's character.

The appellant argues that the third and fourth conditions of the rule were not satisfied in this case. Regarding the third condition, that the court find proof of the other crime, wrong, or act to be clear and convincing, the trial court stated that Douglas's and the appellant's conflicting testimony "probably would not amount to clear and convincing evidence." However, the court specifically stated that Tipton's testimony established clear and convincing proof that the prior theft and threats occurred. Regarding the fourth factor, the trial court specifically found that the probative value of the evidence was outweighed by the danger of unfair prejudice. The appellant testified at trial that David told him to follow them back to Arbutus Avenue, that David and Douglas attacked him, that he did not stab David, and that he did not intend for anyone to get hurt. Therefore, evidence of the prior theft and threats was highly probative of the appellant's motive and intent. Moreover, the probative value of the evidence was not outweighed its prejudicial effect. The trial court did not abuse its discretion by ruling that the evidence was admissible.

### C. Prosecutor's Notes

The appellant contends that the trial court erred by refusing to allow the defense to use the prosecutor's notes for the impeachment of witnesses and that the court erred by refusing to allow the defense to make an offer of proof regarding the State's failure to turn over the notes, which were exculpatory, to the defense before trial. The State argues that the appellant's argument is without merit because the prosecutor's notes were work product. We conclude that appellant is not entitled to relief.

During the State's 404(b) hearing, Mistri Griffith testified on cross-examination that "I gave a written statement when I come up here . . . a while back when we all come up here." She said that "[t]he whole family" met with the prosecutor; that they talked about the case, and that "I never signed anything, but I told them my part – my side of the story." She

said that the prosecutor took notes during the meeting and that "when we left they showed everything that was wrote down." She said that she met with the prosecutor again the week before trial, that they reviewed the notes, and that the notes refreshed her memory. The prosecutor explained to the trial court that he met with the witnesses in February 2008 and that Griffith had "never looked at my notes." Cross-examination resumed, and the following exchange occurred:

> Q. Now, you heard what [the prosecutor] said just now.
>
> A. Yes. They're his notes.
>
> Q. That you hadn't read them.
>
> A. That I hadn't read them?
> I went over them with him.
>
> Q. Okay. Now, when you say, "go over them," what are you talking about?
>
> A. He's asked me what went on and I told him everything that went on, that was said.
>
> Q. All right. And then when you reviewed his notes what went on? How did that take place?
>
> A. It was everything that I said that was said.
>
> Q. And that refreshed your memory?
>
> A. Yes.
>
> Q. And it would help you today to look at them again, refresh your memory?
>
> A. No.
>
> Q. That's what you just told the Court awhile ago; isn't it?
>
> A. Well, I got what – what he understand is, is they're his notes [sic]. I thought you meant . . .

-13-

You had me confused.

But, no, I don't need it to refresh my memory.

. . . .

Q.    He showed them to you?

A.    Yes.

On redirect examination, the prosecutor asked, "Have you ever read my notes?" Griffith answered, "I just seen you write them down." She acknowledged that she met with the prosecutor the week before trial and that he reviewed with her what she had told him in February 2008. She said that she had never read his notes or received a copy of them. Upon being questioned by the trial court, Griffith explained, "No, he never asked me to read [his notes], but I sat there and watched him write down everything that I said. I sat right beside him."

The defense argued that it was entitled to a copy of the notes because "she said that this helped her out and refreshed her memory. And that he showed it to her." The trial court stated that "that puts the Court in a quandary of if it's something adopted by her the defense counsel would be allowed to see it." After a brief recess, the prosecutor stated that he was voluntarily giving the defense "a redacted copy that pertains to what Ms. Griffith was just testifying to." However, the prosecutor also stated that

> this is not the statement of Ms. Griffith. That this was what I was receiving from seven individuals that included Ms. Griffith. That I was summarizing as I was being told this. . . . I would, though, have a standing objection if he tries to use my notes to impeach any witness by a statement they've previously given. I don't think that's proper impeachment material.

The defense informed the trial court that according to the notes, the prosecutor wrote, "'Defendant made no threats.'" The prosecutor responded that he had been talking with Griffith and two other witnesses at the same time when he wrote the sentence and that "I don't know who told me that." However, he also stated, "I gave [defense counsel] the notes concerning what she's testified to." Defense counsel recalled Griffith to the stand and asked if she had ever told the prosecutor that the appellant did not threaten the victim. She answered, "No."

During Mistri Griffith's cross-examination testimony in front of the jury, defense counsel stated, "Now I have a copy of General Perrin's notes when you met with him upstairs." The prosecutor asked to approach the bench and stated, "I don't mind him . . . asking her if she said anything, but I don't think that she can be cross-examined from notes I took when she was not affirmed[.]" The trial court ruled that the defense could treat the notes as Jencks material and ask Griffith "if she said those things." Cross-examination resumed and defense counsel asked Griffith if she ever said the appellant made no threats. Griffith answered, "No, I did not make that statement." Griffith also testified that she met with the prosecutor one time "with the family" and on "one occasion by myself." She said that during the meeting in which just she and the prosecutor were present, the prosecutor took notes.

During a break in Griffith's cross-examination testimony, the defense again argued that it should be allowed to question Griffith from the notes because "she testified . . . that she was the only one present at the time these statements were made." The defense also asked to question the prosecutor about the notes under oath. In a jury-out hearing, the prosecutor, Assistant District Attorney General Joseph Perrin, testified as follows: On February 5, 2008, he met with David Dorton's mother; two cousins; aunt; grandmother; uncle; and fiancé, Mistri Griffith. He said that the meeting "started out as a meeting with them to explain the process of what the court system would entail" and that "we talked in general about the events both preceding the murder and the day of the murder." Perrin acknowledged that during the meeting, he wrote in his notes "'Go ahead and hide behind granny'" and "'Defendant made no threats.'" However, he said that he did not remember who made the latter statement and that his notes did not indicate who, if anyone, made it. The prosecutor's testimony concluded, and the trial court recessed for the day.

The next morning, defense counsel requested to recall Perrin because "I was not furnished with [his notes] during discovery. And it's certainly exculpatory." The prosecutor argued that the notes were work product and that "it's not even a statement as envisioned by Rule 26.2," Tennessee Rules of Criminal Procedure. The trial court ruled that even if the notes amounted to a statement by Griffith, the defense was entitled to the notes after the witness testified, not during discovery. The trial court also refused to allow the defense to question Perrin further, stating, "Well, it's on the record, [defense counsel]. [You] pretty well beat this thing to death yesterday."

The appellant argues that he should have been allowed to impeach the State's witnesses with the notes because Griffith adopted the statement "defendant made no threats" as her own. He also argues that he should have been allowed to question the prosecutor about his failure to provide the defense with the exculpatory statement during discovery.

-15-

Tennessee Rule of Criminal Procedure 26.2(a) provides,

> After a witness other than the defendant has testified on direct examination, the court, on motion of a party who did not call the witness, shall order the attorney for the state or the defendant and the defendant's attorney to produce, for the examination and use of the moving party, any statement of the witness that is in their possession and that relates to the subject matter of the witness's testimony.

A "statement" is defined as "[a] written statement that the witness makes and signs, or otherwise adopts or approves" or "[a] substantially verbatim, contemporaneously recorded recital of the witness's oral statement that is contained in a stenographic, mechanical, electrical, or other recording or a transcription of such a statement." Tenn. R. Crim. P. 26.2(f)(1), (2).

Griffith testified that the prosecutor never asked her to read the notes but that she "sat there and watched him write down everything that I said." The defense asked Griffith if she told the prosecutor that the appellant did not make any threats to the victim, and Griffith said no. We note that the prosecutor's notes are part of the record on appeal. Our review of the notes confirms that nothing indicates Griffith made the statement, "'Defendant made no threats.'" Moreover, nothing indicates that the witness adopted or approved the statement or that the statement is a substantially verbatim recital of anything she told the prosecutor. Therefore, the statement was not Jencks material which the appellant was entitled to receive after Griffith's direct testimony under Tennessee Rule of Criminal Procedure 26.2.

Regarding the appellant's claim that the notes were exculpatory, the State has a constitutional duty to furnish an accused with exculpatory evidence pertaining to the accused's guilt or innocence or to the potential punishment faced by the accused. Brady v. Maryland, 373 U.S. 83, 87 (1963). This duty extends to evidence that may be used by the accused for impeachment purposes. Giglio v. United States, 405 U.S. 150, 154-55 (1972).

We agree that if a witness said the appellant made no threats, the statement would be exculpatory. However, in this case, the State turned over the notes to the defense after the first witness, Deputy Quillen, testified. Therefore, this case involves a situation of delayed disclosure. When there has been a delayed disclosure of evidence, as opposed to a complete nondisclosure, Brady is normally inapplicable unless the delay itself causes prejudice. See State v. Caughron, 855 S.W.2d 526, 548 (Tenn.1993); State v. Joan Elizabeth Hall, No. 01C01-9710-CC-00503, 1999 Tenn. Crim. App. LEXIS 78,(Nashville, Jan. 28, 1999). The appellant must establish that the delayed disclosure prevented him from using the disclosed

-16-

material effectively in preparing and presenting his case. <u>Caughron</u>, 855 S.W.2d at 548.

The appellant did not allege at trial and does not assert on appeal that anyone other than Mistri Griffith made the statement "defendant made no threats." The trial court allowed the appellant to question Griffith about the statement, and she denied making it. The appellant has failed to establish that the delayed disclosure caused prejudice.

Regarding the appellant's claim that the trial court erred by refusing to allow him to make an offer of proof as to Assistant Attorney General Perrin's failure to turn over the notes before trial, defense counsel argued that further questioning was necessary because Perrin "sat with six witnesses" and "either all of them said there were no threats, or none of them said that." However, Assistant Attorney General Perrin already had testified that he could not remember who, if anyone, made the statement. The appellant has not explained why he needed to question Perrin further. Therefore, we find no merit to his claim that the trial court erred by refusing to allow him to make an additional offer of proof.

### D. Surrebuttal Testimony

The next issue in the appellant's brief is titled "**That the Court erred by not allowing the Defendant's counsel to present cross rebuttal testimony to Ms. Sarah Dorton's direct rebuttal testimony.**" However, in his explanation of the issue and the relevant law, the appellant does not address anything related to Sarah Dorton's testimony. Instead, he again argues that the trial court erred by refusing to allow him to cross-examine Mistri Griffith about the statement in the prosecutor's notes. As explained above, the appellant is not entitled to relief on that issue. To the extent that the appellant meant to address the trial court's failure to allow him to present surrebuttal testimony, that issue is waived for the appellant's failure to explain the issue, address why the issue requires appellate relief, and cite to the authorities and appropriate references in the record. <u>See</u> Tenn. R. App. P. 27(a)(7)(A); Tenn. R. Ct. Crim. App. 10(b). Regardless, the appellant is not entitled to relief.

Sarah Dorton testified that she saw the appellant's Tahoe in her driveway within one month of the stabbing and that the appellant demanded money from David. At the conclusion of the State's rebuttal case, the defense asked to recall the appellant in order "to ask him just the – if he did – that's true or not." The trial court refused to allow the surrebuttal testimony because the appellant had already testified that the incident never occurred.

"Following the state's rebuttal, the defendant is entitled to present surrebuttal evidence to explain, contradict, or directly reply to the state's rebuttal evidence." <u>State v. Thompson</u>,

43 S.W.3d 516, 524 (Tenn. Crim. App. 2000). It is within the trial court's discretion to admit surrebuttal evidence. Id.

Our review of the appellant's testimony confirms that the appellant adamantly denied pulling his Tahoe into Sarah Dorton's driveway or yelling that he wanted his money. Given that the appellant's surrebuttal testimony would have been cumulative to his case-in-chief testimony, we cannot say that the trial court abused its discretion by refusing to allow the defense to recall him to the stand. See also Tenn. R. Evid. 403 (providing that even relevant evidence may be excluded by considerations of waste of time or needless presentation of cumulative evidence).

### E. Double Jeopardy

Finally, the appellant contends that his first degree premeditated murder conviction and his conviction for the aggravated assault of David Dorton violate double jeopardy because there was no break in the chain of events. The State contends that the appellant's convictions for both offenses do not violate double jeopardy principles. We agree with the State.

The double jeopardy clauses of the United States and Tennessee Constitutions protect an accused from (1) a second prosecution following an acquittal; (2) a second prosecution following conviction; and (3) multiple punishments for the same offense. See State v. Denton, 938 S.W.2d 373, 378 (Tenn. 1996). The appellant contends that the present case involves the third category. In Tennessee, whether two offenses are the "same" for double jeopardy purposes depends upon a close and careful analysis of the offenses involved, the statutory definitions of the crimes, the legislative intent, and the particular facts and circumstances. See State v. Black, 524 S.W.2d 913, 919 (Tenn. 1975). This analysis is guided in part by the application of the following test announced in Blockburger v. United States:

> Where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not.

Black, 524 S.W.2d at 919 (quoting Blockburger, 284 U.S. 299, 304 (1932). In order to determine if double jeopardy attaches, our supreme court devised the following four-part test:

(1) a Blockburger analysis of the statutory offenses;

(2) an analysis, guided by the principles of [Duchac v. State, 505 S.W.2d 237, 239 (Tenn. 1973)], of the evidence used to prove the offenses;

(3) a consideration of whether there were multiple victims or discrete acts; and

(4) a comparison of the purposes of the respective statutes.

Denton, 938 S.W.2d at 381. However, "if the offenses are the 'same' under Blockburger, the federal constitutional double jeopardy protections have been violated and the inquiry may end." State v. Hayes, 7 S.W.3d 52, 55 (Tenn. Crim. App. 1999).

The appellant contends that both convictions violate the second part of the double jeopardy test because "the evidence used to prove both the offenses stems from the same continuous act." We disagree. As stated previously, first degree premeditated murder is the premeditated and intentional killing of another person. Tenn. Code Ann. § 39-13-202(a)(1). In contrast, aggravated assault occurs when a person intentionally or knowingly causes another to reasonably fear imminent bodily injury commits an assault by using or displaying a deadly weapon. Tenn. Code Ann. §§ 39-13-101(a)(2), -102(a)(1)(B). Obviously, the offenses required proof of different elements. See also State v. Adams, 973 S.W.2d 224, 229 (Tenn. Crim. App. 1997) (stating that "[a]pplication of the Blockburger test indicates that the legislature intended to allow separate punishment for each of these offenses)." Moreover, after the appellant chased the Dortons, David parked the Geo at Douglas's trailer, and the appellant parked the Tahoe in a neighbor's driveway. At that point, the appellant's aggravated assaults of the Dortons were complete. David then got out of the Geo and walked down the hill to the appellant's Tahoe. The appellant reached out of the Tahoe and stabbed David in the abdomen with a switchblade knife. While both offenses resulted from the same criminal episode, they do not violate constitutional protections against double jeopardy.

## III. Conclusion

Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

_____
NORMA McGEE OGLE, JUDGE